**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**TOM KELLY**, a married man, dba
KELLY RANCH, a New Mexico business entity,

      Plaintiff,

v.                                        **No. 10-CV-700 MCA/RHS**

**UNIFEED HI-PRO INC**., a Texas corporation;
**JOHN and JANE DOES 1-5;**
**XYZ CORPORATIONS OR BUSINESS
ENTITIES 1-5**; and
**ABC GOVERNMENT ENTITIES 1-5,**
      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendant Unifeed Hi-Pro Inc.'s, ("Hi-Pro") *Partial Motion to Dismiss Complaint*, filed August 2, 2010 [Doc. 7]. Hi-Pro seeks dismissal with prejudice, under FED. R. CIV. P. 12(b)(6), of Plaintiff Tom Kelly's claims against Hi-Pro for intentional spoliation of evidence; negligent spoliation of evidence; cruelty to animals; negligence per se; negligent hiring, training, management, and supervision; and what Hi-Pro describes as "an apparent class action," for failure to state a claim upon which relief can be granted[1]. Doc. 7 at 1. The Court, having considered the parties' arguments and the relevant law, and otherwise being fully advised in the premises, finds that the motion should be granted in part and denied in part.

**A.  Standard of Review**

Under Fed. R. Civ.P. 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." The sufficiency of a complaint is a question of law, and when

---

[1] Hi-Pro also contends that the Court must grant its motion to dismiss because Kelly failed to file a timely response, thereby consenting to Hi-Pro's motion. See D.N.M.LR-Civ. 7.1(b). The Court will not grant the motion to dismiss solely because Kelly was four days late in filing his response, but the Court admonishes counsel that he must comply with our local rules.

considering and addressing a motion to dismiss pursuant to rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006). Further, in order to withstand a rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal citation omitted) (Iqbal). If a plaintiff cannot nudge the claims "across the line from conceivable to plausible," the complaint must be dismissed. Id. at 570.

In handing down Twombly, our United States Supreme Court invalidated the longstanding rule that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Conley standard has proved problematic over the years because it suggests that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 550 U.S. at 561 *quoting* Conley, 355 U.S. at 45-46. As a result, defendants may be forced to bear the burden and expense of discovery before they are afforded a real opportunity to seek the dismissal of groundless claims, while plaintiffs may use the burdensome discovery process as leverage to induce otherwise unjustified settlement of such groundless claims. See Twombly, 550 U.S. at 557-59.

A complaint is now subject to dismissal under the new standard if it does not "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557 *quoting*

2

Fed. R. Civ. P. 8(a)2). In other words, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hask, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

Two "working principles" underlie the Twombly standard. Iqbal, 129 S.Ct. at 1949.

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

Id. at 1949-50 (internal citations omitted). Thus, in order to evaluate a motion to dismiss, the Court engages in a two-part inquiry by initially identifying those allegations that are nothing more than legal conclusions and therefore "not entitled to the assumption of truth" and then considering whether the factual allegations "plausibly suggest an entitlement to relief." Id. at 1951. Accordingly, the Court will evaluate the elements of the pleaded causes of action, in order to determine whether the complaint states sufficient factual allegations to implicate a claim for relief. See id. at 1947.

**B.  Factual and Procedural Background.**

Kelly alleges that he bought deficient mineral feeds from Hi-Pro in 2008 and 2009, which caused "lethal imbalances of copper and other nutrients" and resulted in the "illness, suffering and deaths of more than 40 cows, the loss of hundreds of calves, and substantial economic loss." Complaint at 1. Kelly alleges that some of the Hi-Pro mineral feed was deficient in copper and other nutrients; and that other batches of feed contained excessive or "hot spots" of copper. Id. at 5. Kelly

3

alleges that Hi-Pro was aware of manufacturing defects in its plant that negatively affected the quality of its various feed products, making them detrimental to the health of the cattle to which they were fed and causing economic harm to the ranchers who bought the feed. Id. at 4-5.

Under the heading "Products Liability," Kelly set forth several alternative theories of liability, including "strict liability; negligence; negligence *per se;* and breach of contracts, warranties, and covenants." Id. at 7. He alleged that Hi-Pro failed to use ordinary care in the formulation, design, manufacturing, inspection, testing, packaging and distribution of its products and that it failed to provide adequate warnings that its products "could have toxic effects." Id. at 8. He contends that Hi-Pro violated USDA regulations and standards, including the relevant "current Good Manufacturing Practices," and that it also violated New Mexico's Commercial Feed Law and cruelty-to-animals statute. Id. at 8-9.

Under the heading "Unfair Trade Practices," Kelly alleged violation of the New Mexico Unfair Trade Practices Act. See id. at 10-12. Under another heading, Kelly brought state-law claims for "Misrepresentation and Fraud." Id. at 12-14.

Kelly set forth a separate heading entitled "Spoliation of Evidence." Id. at 14. In this section, he alleged that Hi-Pro had received "timely notices of nutritional concerns" regarding his cattle, including a notice that a claim "may be brought against it because its commercial feeds may have caused harm." Id. He alleged that, after receiving this notice, Hi-Pro "negligently disposed of samples of the feed at issue" and may also have "concealed, mutilated, or altered samples and other evidence that it knew or should have known would be relevant to death loss investigations and claims for damages." Id. He also alleged that Hi-Pro "intentionally disposed of evidence relevant to [his] potential illness and death loss claims," which "severely prejudiced [him] in the preparation of [his] case for trial." Id. at 15. As a remedy, he requested "default judgment;" or that the Court

4

strike any defenses that Hi-Pro may bring to which the destroyed evidence would be relevant; or that the jury be instructed that it could infer from the fact that the evidence was destroyed that it would have been helpful to Kelly and damaging to Hi-Pro; or that Hi-Pro be otherwise "sanctioned by the Court." Id.

Under the heading "Cruelty to Animals," Kelly alleged that Hi-Pro's conduct violated New Mexico's criminal statutes and caused his cattle to suffer "long and tortuous illnesses" leading to death or "suffering in varying degrees." Id. at 15-16.

Under the heading "Vicarious Liability" Kelly contends that Hi-Pro is liable for the damaging acts and omissions of its agents and employees. Id. at 16.

And under the heading "Negligent Hiring, Training, Management and Supervision," Kelly alleged that Hi-Pro was directly liable for the actions of its agents and employees that gave rise to the allegations in the Complaint. Id.

**C.  Analysis.**

**1.  Claim for negligent or intentional spoliation.**

Hi-Pro contends that Kelly's "claim" for negligent spoliation of evidence should be dismissed because there is no separate tort for negligent spoliation in New Mexico. See Doc. 7 at 2. It contends that a claim for intentional spoliation must be dismissed because Kelly did not allege that Hi-Pro acted with the requisite intent, which is "with the sole intent to maliciously defeat or disrupt a lawsuit." See id.; id. at 5. And it contends that both claims must be dismissed because the "Complaint makes it clear that he *already* has access to and control over the critical evidence he needs to bring his claim," thus he "cannot establish that any improper acts of destruction have deprived him of the ability to prove his claims." Id. at 2 (italics in original). After raising this third argument based on its factual assertions, Hi-Pro incongruously criticizes Kelly's response that

5

includes attachments to rebut the factual correctness of Hi-Pro's statements. The Court will disregard the affidavits and copies of e-mails that Kelly attached to his response to the motion to dismiss that he contends establishes spoliation, see Smith v.United States, 561 F.3d 1090, 1098 (10th Cir. 2009), and will resolve the solely legal questions based on the allegations in the Complaint, accepted as true, and the relevant law[2].

When a party alleges and proves that the opposing party has destroyed evidence relevant to a potential lawsuit, New Mexico recognizes several remedies for the spoliation of that evidence. While New Mexico does not "recognize the negligent destruction of potential evidence as a separate tort," Coleman v. Eddy Potash, Inc., 120 N.M. 645, 650, 905 P.2d 185, 190 (1995), *overruled on other grounds by* Delgado v. Phelps Dodge Chino, Inc., 131 N.M. 272, 34 P.3d 1148 (2001),

> [w]here the actions of the spoliator fail to rise to the level of malicious conduct or otherwise meet the elements of the tort of intentional spoliation of evidence, we believe a more appropriate remedy would be a permissible adverse evidentiary inference by the jury in the underlying claim. This evidentiary inference could be accomplished through an instruction to the jury that it is permissible to infer that evidence intentionally destroyed, concealed, mutilated, or altered by a party without reasonable explanation would have been unfavorable to that party. Trial courts, in determining whether to give this instruction, should consider whether the spoliation was intentional, whether the spoliator knew of the reasonable possibility of a lawsuit involving the spoliated object, whether the party requesting the instruction "acted

---

[2] Hi-Pro speculates that, because Kelly obtained test results on feed he still had in 2009, "it is difficult to imagine any evidence that Hi-Pro could have destroyed that could possibly result in an inability to prove Plaintiff's claims." Doc. 7 at 7. But Kelly contends that Hi-Pro sold other feed that did not meet "custom formulation requirements" and that was not properly manufactured on the same equipment with which it produced the mineral feed; that the substandard feed demonstrated "flaws" in the processes Hi-Pro was using; that the mineral feed did not meet the "guaranteed analysis" amounts printed on its packaging; that Hi-Pro knew that its products did not meet the standard or qualities as advertised, and that Hi-Pro failed to properly inspect and test its products. See Complaint at 4, 8-10. If Hi-Pro regularly inspected its product quality and the test results showed that it was producing products that did not contain the proper ratios of ingredients, those test results could show whether Hi-Pro knew, before it sold its mineral feed to Kelly, that its processing plant was producing defective products because of a manufacturing flaw. Such knowledge could be relevant both to Kelly's unfair-trade-practices claim and to a claim for punitive damages..

with due diligence with respect to the spoliated evidence," and whether the evidence would have been relevant to a material issue in the case.  *See Beers v. Bayliner Marine Corp.*, 236 Conn. 769, 675 A.2d 829, 832-33 (1996).  It is not necessary that the spoliator act with malice or bad faith.  *See Beers*, 675 A.2d at 833 ("By [the requirement of intentional spoliation], we do not mean that there must have been an intent to perpetrate a fraud by the party ... but, rather, that the evidence had been disposed of intentionally and not merely destroyed inadvertently." (footnote omitted)); *Miller v. Montgomery County*, 64 Md. App. 202, 494 A.2d 761, 768 (1985) ("Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable to his [or her] cause, but it would not in itself amount to substantive proof of a fact essential to his [or her] opponent's cause."); *State ex rel. Comm'r of Transp. v. Council in the Div. of Resource Dev.*, 60 N.J. 199, 287 A.2d 713, 715 (1972) (stating that a permissible adverse inference applies if there is "[a] conscious awareness of the existence of a dispute with another and a conscious awareness that an act done will destroy evidence or access to evidence").

Torres v. El Paso Elec. Co., 127 N.M. 729, 749-50, 987 P.2d 386, 405-06 (1999), *overruled in part on other grounds by* Herrera v. Quality Pontiac, 134 N.M. 43, 73 P.3d 181 (2003).  Further, under New Mexico law,

> [a] remedy for the destruction of evidence may be available pursuant to the inherent power of the courts 'to impose sanctions on both litigants and attorneys in order to regulate their docket[s], promote judicial efficiency, and deter frivolous claims.' *Martinez v. Martinez*, 1997-NMCA-096, ¶ 23, 123 N.M. 816, 945 P.2d 1034.  The courts' inherent power exists apart from established criminal and civil remedies.  *See State ex rel. State Highway & Transp. Dep't v. Baca*, 120 N.M. 1, 4, 5, 896 P.2d 1148, 1151, 1152 (1995) (stating that these "powers inhere in judicial authority and exist independent of statute" and are not displaced by statute or rule).  The rationale underlying the existence of the inherent power of the courts is that "a court must be able to command the obedience of litigants and their attorneys if it is to perform its judicial functions." *Id.* at 4, 896 P.2d at 1151.
> . . . .
> As we have indicated, "[d]estruction of potentially relevant evidence ... occurs along a continuum of fault." *Welsh*, 844 F.2d at 1246.  The first prong of the analysis requires the court to determine where along the continuum the offending party's conduct fell.  We do not undertake to define here all possible levels of culpability that might support sanctions.  We acknowledge, though, that "a finding of 'bad faith' or 'evil motive' is not a prerequisite to imposition of sanctions for destruction of evidence." *Baliotis*, 870 F. Supp. at 1291; *see also Gonzales*, 120 N.M. at 158, 899 P.2d at 601.  The point is simply that "[t]he motive for the destruction of evidence is . . . relevant to determining what sanctions, if any, should be imposed.  *Schmid* makes clear that it is 'the degree of fault' that is at issue."

*Baliotis*, 870 F. Supp. at 1291.

The second prong requires the court to look closely at the relevance of the destroyed evidence to the various causes of action, and more specifically at the effect that the loss of the evidence might have on the non-spoliating party's ability to prepare and present a case.

> [T]he destroyed evidence must be relevant to the issue or matter for which the party seeks the [sanction]. For example, the spoliation of a machine may raise an adverse inference with respect to a claim that that particular machine was defective, but such an inference may not be drawn with respect to a claim based upon design defect when the destruction would not hinder the defense.

*Beers v. Bayliner Marine Corp.*, 236 Conn. 769, 675 A.2d 829, 833 (1996); *see also Schmid*, 13 F.3d at 79. Thus in this case, the district court must evaluate the effect of the loss of the fire-suppression system on each Defendants' ability to defend against Plaintiffs' claims and to lay off responsibility on others potentially at fault for the loss.

. . . .

The third prong of the analysis requires the court to balance the degree of fault of the spoliator's conduct against the magnitude of prejudice to the non-spoliating party, and to levy a sanction accordingly. The range of possible sanctions allows the court to try to offset, to the extent possible, whatever prejudice non-spoliating parties face, while at the same time to permit offending parties whose conduct does not rise to the level of bad faith to continue to pursue their claims, though under an appropriate handicap. In addition, it allows the court to levy severe sanctions "where the offending party is seriously at fault . . . to deter such conduct by others in the future." *Schmid*, 13 F.3d at 79.

One of the sanctions a court might appropriately impose is a "spoliation inference"; that is, "[a]n instruction to the jury that it may consider that the lost evidence would be unfavorable to the [spoliating party]." *Baliotis*, 870 F. Supp. at 1292. If a spoliation inference is given to a jury, the jury should also "be instructed that it is not required to draw the inference that the destroyed evidence would be unfavorable but that it may do so" based on its view of the first two factors. *Beers*, 675 A.2d at 833.

Alternatively, a court may exclude certain of the spoliator's evidence. *See Unigard*, 982 F.2d at 368; *Howell v. Maytag*, 168 F.R.D. 502, 507-08 (M.D. Pa.1996) (mem.).

Rest. Mgmt. Co. v. Kidde-Fenwal, Inc.,127 N.M. 708, 712-13, 986 P.2d 504, 508-09 (Ct. App. 1999).

8

A careful review of the Complaint and Kelly's brief indicates that Kelly is not attempting to bring separate tort claims for spoliation, but rather, that Kelly appears to seek relief by way of evidentiary restriction or other sanctions, including imposition of liability, for the alleged spoliation. Insofar as Kelly may have been attempting to state a separate tort claim for negligent spoliation of evidence, the Court will dismiss it because such a claim is not legally cognizable.

"[T]he tort [of intentional spoliation of evidence] recognized in *Coleman* seeks to remedy acts taken with the sole intent to maliciously defeat or disrupt a lawsuit," and a jury could award the affirmative relief of damages if the Plaintiff can establish all the elements of the tort. Torres, 127 N.M. at 748; 987 P.2d at 405. Kelly does not respond to Hi-Pro's legal argument that a tort claim for intentional spoliation must be dismissed because Kelly failed to allege that Hi-Pro's "sole intent" was to maliciously defeat a lawsuit. Instead, Kelly contends that the Court could impose more serious sanctions for intentional spoliation conduct, including deeming admitted key facts or striking defenses, and argues that the proper remedies must await discovery. See Doc. 12 at 10. Nor does Kelly request an opportunity to amend his complaint to allege facts supporting the "sole intent" requirement of the separate tort. Again, insofar as Kelly may have been attempting to allege a separate tort claim for intentional spoliation, the Court will dismiss the claim at this juncture because of his failure to specifically allege that, by its conduct, Hi-Pro's sole intent was to "maliciously defeat or disrupt a lawsuit." Torres, 127 N.M. at 748, 987 P.2d at 405. Kelly may seek leave to amend the Complaint, in conformance with the rules, should he have a good-faith basis for doing so. Further, the relief which Kelly seeks (limitation of evidence and/or imposition of sanctions) is premature for consideration. Depending on the evidence adduced and developed, the Court will, at the appropriate time, or on an appropriate motion, consider whether to provide the jury with an instruction regarding spoliation or whether to impose sanctions. See Segura v. K-Mart Corp., 133

9

N.M. 192, 194-96, 62 P.3d 283, 285-87 (Ct. App. 2002) (discussing appropriateness of spoliation sanctions and affirming as sanction court's instruction that the defendant "was negligent and that its negligence was a proximate cause of" the plaintiff's injury).

**2. Claims for cruelty to animals.**

Hi-Pro seeks dismissal of Kelly's claims for cruelty to animals, as defined by NMSA 1978, § 30-18-1(B) and (E), because these criminal statutes do not create a private right of action. To find a private right of action to bring a civil suit on the basis of a criminal statute, New Mexico courts require a showing of "express language in the statute creating a private right of action." Eisert v. Archdiocese of Santa Fe, 146 N.M. 179, 188, 207 P.3d 1156, 1165 (Ct. App. 2009). Otherwise, the courts "conclude that the Legislature did not intend to create such a right of action." Id. Clearly, the New Mexico Legislature knows how to expressly provide for civil remedies in its criminal statutes. See, e.g., N.M.S.A. 1978, § 30-14-1(D) (providing, in criminal-trespass statute, that one who commits criminal trespass "shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to double the value of the damage to the property injured or destroyed"). There is no such civil remedy in the statutes at bar.

The authorities cited by Kelly in support of his argument that the public policy of deterrence supports an inferred private cause of action are distinguishable from the present case because none of them involve criminal statutes. Those cases are not persuasive. The Court will dismiss Kelly's separate claims for cruelty to animals.

**3. Claims for negligence *per se*, and negligent hiring, training, management, and supervision.**

Hi-Pro does not seek dismissal of Kelly's claims for negligence. It contends that the Court must dismiss any negligence or product-liability claims based on negligence *per se* because the statutes that Kelly contends were violated do not provide for a private right of action. Again, after

10

a careful reading of the Complaint, this Court does not construe the pleading as separately requesting relief under the theory of negligence *per se*. Instead, based on the wording in the Complaint and his brief in response to the motion to dismiss, it appears that Kelly seeks to establish his products-liability or basic negligence claims by demonstrating that Hi-Pro had a statutorily-imposed duty to provide to him cattle feed that met certain standards.

Negligence *per se* is a "theor[y] of negligence" in which liability for negligence may be established by proof that a defendant violated a statute, regulation, or ordinance intended to protect a particular class of people, and that the violation caused the plaintiff's harm or injury. Sanchez v. J. Barron Rice, Inc., 77 N.M. 717, 723, 427 P.2d 240, 244-45 (1967). A negligence-*per-se* instruction may be given to establish, as a matter of law, the duty and standard of care the defendant owed to the plaintiff if the statute does not merely "restate the common law standard of ordinary care," but rather "define[s] with specificity what is 'reasonable' in a particular circumstance, such that the jury does not have to undertake that inquiry." Heath v. La Mariana Apartments, 143 N.M. 657, 660, 180 P.3d 664, 667 (2000); see id. at 663, 180 P.3d at 670 (citing case noting that "[t]he doctrine of negligence *per se* serves to superimpose a legislatively prescribed standard of care on the general standard of care") (internal quotation marks omitted). As Hi-Pro concedes, New Mexico's Commercial Feed law provides that "[n]o person shall distribute an adulterated feed," and lists eight subsections defining various standards and circumstances in which a feed will be deemed to be adulterated. See N.M.S.A. § 76-19-7. The statute, therefore, does not merely restate the common-law standards for ordinary care. Further,

> negligence *per se* should not be equated with strict liability . . . . Negligence *per se* is established by a showing that the defendant's conduct was such that it breached a duty to meet a certain standard of care, whereas strict liability in tort arises not from conduct proscribed or prescribed under a common law or statutory duty of care, but from circumstances that may exist independent of and regardless of the conduct

>of the tortfeasor. A defendant can rebut an allegation of negligence *per se* with proof
>of an excuse for the violation, a possibility that is not allowed for in strict liability.

Heath, 143 N.M. at 663 n.3, 180 P.3d at 670 n.3 (internal quotation marks and brackets omitted).

Kelly may proceed with his theory of negligence based upon alleged violation of the commercial feed statutes and relevant good manufacturing practices.

The Court is not persuaded by Hi-Pro's further contention that claims based on the relevant good-manufacturing-practices standards must be dismissed because Kelly did not state with specificity in his Complaint exactly which practices Hi-Pro failed to follow. But he it has not already done so in his Rule 26 disclosures or answers to interrogatories, Kelly must specify in writing, if he now knows, the specific standards he contends that Hi-Pro failed to follow.

Hi-Pro contends that Kelly failed to support a claim against it for negligent hiring, training, management, and supervision of its agents and employees with any facts in the Complaint. Kelly responds that, if a plaintiff alleges facts that a company is manufacturing defective products, it is reasonable to infer from those facts that it has been negligent in training, managing, or supervising its employees who operated the machinery or who should have been inspecting the product for quality control. The Court concludes that Kelly's Complaint is sufficient to allege the claim; the results of discovery and testimony at trial will determine whether there is sufficient evidence to support a jury instruction on the issue. The Court will not dismiss this claim.

**4. Class action.**

Finally, Hi-Pro construes Kelly's Complaint as an unsuccessful attempt to bring a class-action suit because, (1) in the section alleging violation of the Unfair Practices Act, Kelly contends that the Act provides that "each person or entity" that received the supposedly adulterated feeds from Hi-Pro "should be awarded damages suffered as a result of Hi-Pro's unlawful method, act or

practice," Complaint at 11; (2) Kelly contends that treble damages should be awarded under the Act to "both the individual plaintiffs and putative class member with respect to both unfair or deceptive trade practices and unconscionable trade practices," Complaint at 12; and (3) Kelly requests "class-wide damages in accordance with the Unfair Practices Act," Complaint at 19.  See Doc. 7 at 17.  Kelly responds that he was making only a claim for "class compensation" under the Act and attempting to "preserve[] the rights of others who received the same bad feed."  Doc. 12 at 2, 14.

Both Hi-Pro's and Kelly's assertions lack merit.  It is clear to the Court that Kelly is not attempting to bring a class-action lawsuit.  It is equally clear that a person cannot "preserve the rights of others" by filing a suit and that "class compensation" or damages cannot be awarded under the Act to unnamed class members.  See N.M.S.A. 1978, § 57-12-10(E) ("In any class action filed under this section, the court may award damages to the named plaintiffs as provided in Subsection B of this section and may award members of the class such actual damages as were suffered by each member of the class as a result of the unlawful method, act or practice.").  The Court will not dismiss a class-action claim that does not exist because no attempt was ever made to bring such a claim.

**IT IS THEREFORE HEREBY ORDERED** that the partial motion to dismiss is **GRANTED in part** and **DENIED in part** as set forth above and that, insofar as the Complaint may be reasonably construed as stating separate tort claims for negligent spoliation of evidence and for cruelty to animals, such claims are **DISMISSED** with prejudice.

**SO ORDERED** this 9th day of March, 2011, in Albuquerque, New Mexico.

          **M. CHRISTINA ARMIJO**
          United States District Judge